IN THE SUPREME COURT OF NORTH CAROLINA

No. 302A14

Filed 8 June 2018

STATE OF NORTH CAROLINA

v.

JUAN CARLOS RODRIGUEZ

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge R. Stuart Albright on 21 March 2014 in Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court on 10 October 2016. Following the initial oral argument, this case was reargued on 9 October 2017.

*Josh H. Stein, Attorney General, by Mary Carla Babb and Kimberly N. Callahan, Assistant Attorneys General, for the State.*

*Glenn Gerding, Appellate Defender, by Barbara S. Blackman, John F. Carella, and Kathryn L. VandenBerg, Assistant Appellate Defenders, for defendant-appellant.*

ERVIN, Justice.

Defendant Juan Carlos Rodriguez was convicted of the first-degree murder of his estranged wife, Maria Magdelana Rodriguez, and sentenced to death. After careful consideration of defendant's challenges to his convictions and sentence in light of the record and the applicable law, we find no error in the proceedings leading to

defendant's conviction and the jury's rejection of his intellectual disability defense.[1]

On the other hand, we conclude that the trial court erred by failing, acting *ex mero motu*, to submit the statutory mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(6) ("[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired") to the jury at defendant's capital sentencing hearing. As a result, we vacate defendant's death sentence and remand this case to the Superior Court, Forsyth County, for a new capital sentencing hearing.

### I. Factual Background

### A. Substantive Facts

### 1. State's Evidence

Defendant and Ms. Rodriguez became emotionally involved with each other in late 1992. The couple married when Ms. Rodriguez was thirteen years old and defendant was sixteen or seventeen years old and had their first child when Ms. Rodriguez was fourteen years old. Unfortunately, defendant became physically and emotionally abusive towards Ms. Rodriguez following their marriage. This pattern of domestic violence continued after the couple came to the United States.

On 11 October 2010, Ms. Rodriguez entered a domestic violence shelter with her three children because she could "no longer live with [her] husband" and did not

---

[1] Although the statutory provisions in effect at the time of defendant's trial spoke in terms of "mental retardation," this opinion will use the currently applicable nomenclature of "intellectual disability" in lieu of the earlier statutory expression.

"have anywhere else to go." At the time that she entered the shelter, Ms. Rodriguez noted on an intake form that defendant had threatened to kill her, controlled most of her daily activities, and was violently jealous of her. Although Ms. Rodriguez left the shelter on 19 October 2010, she returned on 29 October to retrieve certain medications that she had left at that location. During the 29 October visit to the domestic violence shelter, Ms. Rodriguez seemed "happy" and "optimistic" and told shelter personnel that, while she was "doing well" and while Mr. Rodriguez "ha[d] not tried to move back in," "she [wa]s struggling to find employment" and "need[ed] assistance with food." On the other hand, Ms. Rodriguez told her friend, Merlyn Rodriguez, on 17 November 2010, that she was afraid of defendant; that he had "told her that if they didn't get back together, he would kill her"; and that "he could get rid of her and just throw her in the river."

On 18 November 2010, defendant came to the couple's former apartment, which was located at 1828 Trellis Lane in Winston-Salem and in which Ms. Rodriguez and the children had resided following the couple's separation, and asked Ms. Rodriguez to speak with him privately in the master bedroom. After a few minutes, the Rodriguez children, who were listening to music in the living room, heard Ms. Rodriguez cry for help. Santos Estela Rodriguez, one of the couple's children, attempted to open the door to the master bedroom but found that it was locked.[2] After

---

[2] Defendant's son, Juan Carlos Rodriquez, gave an account of the events that occurred at the 1828 Trellis Lane apartment that closely resembled that provided by Santos Estela Rodriquez.

failing to gain access to the master bedroom by using a knife, Santos Estela Rodriguez told defendant that she was going to call the police. Shortly thereafter, defendant emerged from the master bedroom with blood on his knuckles, feet, and clothes. As soon as Santos Estela Rodriguez entered the master bedroom and "saw her mother on the floor" "breathing really hard," defendant stated that Ms. Rodriguez had hurt herself on the furniture and that he was taking Ms. Rodriguez to the hospital. After hoisting Ms. Rodriguez over his shoulder, defendant carried her to his vehicle.

Several hours later, defendant returned to 1828 Trellis Lane without Ms. Rodriguez. Upon arriving at the apartment, defendant asked the children and the son of a neighbor to help him clean the blood stained carpeting in the master bedroom. Although Santos Estela Rodriguez called all of the nearby hospitals, she was never able to locate her mother. On the following morning, 19 November 2010, defendant took the children to the home of his boss, Henry Ramirez, who lived in Eden. During the trip to Eden, Santos Estela Rodriguez observed the presence of blood in defendant's vehicle. A subsequent examination of defendant's vehicle by investigating officers revealed the presence of vomitus on the rear floorboard on the driver's side and blood on the interior of the rear driver's side door jamb, the back portion of the rear seat, a tan shirt located upon the upper portion of the rear seat, the rear floor mat on the driver's side, and the spare tire cover in the trunk.

At the time that investigating officers searched the apartment at 1828 Trellis Lane, they noticed that the premises were in disarray and that cleaning products

could be found throughout the residence. "[A] large pool of blood or a large stain of what appeared to be blood [could be seen] on [the] carpet." According to another investigating officer, the carpet in the master bedroom "was discolored a pinkish color" and "frayed as though it had been scrubbed." Additional blood spatter patterns could be observed in the master bedroom as well.

At about 11:30 p.m. on 18 November 2010, Merlyn Rodriguez 's sister, Zoila Rodriguez , began receiving messages from Ms. Rodriguez's phone. The messages received from Ms. Rodriguez 's phone stated that:

> Soyla, I went with my secret boyfriend to Spain. Carlos does not know. If he calls, tell him the truth and take care of the children. I met him three months ago. Cut the phone off because it doesn't work in the airport. Good-bye. I will call you from Spain. . . . I don't have a charge anymore. Good-bye. Cut the telephone off. Later, I will fix it. I will call you from there.

Although Ms. Rodriguez knew how to spell Zoila Rodriguez's name, defendant later spelled Zoila's name as "Soyla" while conversing with investigating officers.

On 19 November 2010, Merlyn Rodriguez attempted to telephone Ms. Rodriguez on several occasions. However, each of Merlyn Rodriguez's calls went unanswered. After ascertaining that Ms. Rodriguez was not in her apartment, Merlyn Rodriguez called defendant, who initially told Merlyn Rodriguez that he did not know where Ms. Rodriguez was before stating that Ms. Rodriguez had "[s]tepped out of the house that night" and "never came back" and finally telling Merlyn

Rodriguez that Ms. Rodriguez had "had an accident that night" and "was at the hospital."

Following her conversation with defendant, Merlyn Rodriguez called the police. Officer L.N. Williams of the Winston-Salem Police Department responded to Merlyn Rodriguez's missing person report, entered Ms. Rodriguez's apartment, and determined that she was not there. At that point, Officer Williams obtained defendant's phone number from Merlyn Rodriguez and called defendant for the purpose of inquiring into Ms. Rodriguez's whereabouts. Defendant told Officer Williams that Ms. Rodriguez had gone for a walk and did not return. After ascertaining that Ms. Rodriguez was not at work or at a local shelter and that the Rodriguez children were not in school, investigating officers began treating this matter as a high-risk missing person's case.

Defendant spent the night of 19 November 2010 with his pastor, David Agueda, in Martinsville, Virginia. On the following morning, while leading Saturday services, Pastor Agueda learned that investigating officers were looking for defendant and Ms. Rodriguez. Upon obtaining this information, Pastor Agueda advised defendant to turn himself in.

At approximately 7:00 p.m. on 19 November 2010, Lieutenant Steven Tollie of the Winston-Salem Police Department reclassified the case as a homicide and assigned it to Detective Stanley Nieves. After investigating officers located defendant on 21 November 2010, he was taken to Eden to be interviewed by Detective Nieves.

In response to Detective Nieves's request that he describe the events that had occurred on 18 November 2010 at the 1828 Trellis Lane apartment, defendant stated that Ms. Rodriguez had told him that she was a lesbian and no longer wanted to be with him, that Ms. Rodriguez had hit her head against the dresser while lunging at him, and that Ms. Rodriguez had called for help after falling to the floor. At that point, defendant assisted Ms. Rodriguez in her efforts to get up, carried her to his car, and began to drive her to the hospital. As he did so, Ms. Rodriguez told defendant to stop, left the vehicle, and walked out of defendant's sight. Although Detective Nieves repeatedly accused defendant of having killed Ms. Rodriguez and having knowledge of the location at which Ms. Rodriguez's body could be found, defendant repeatedly denied Detective Nieves's accusations.

On the afternoon of 12 December 2010, which was a "very cold, damp" day featuring light snow and misty rain, investigating officers received a report that a decapitated body had been discovered in an area near 5020 Williamsburg Road in Winston-Salem that was "overgrown with small bushy pines" about "40 to 50 feet to the west of the asphalt area." Fingerprint information obtained from the body established that it was that of Ms. Rodriguez. On 29 May 2013, a human skull, later determined to be that of Ms. Rodriguez through the use of DNA analysis, was found in a wooded area near Belews Lake in rural Forsyth County.

According to Patrick Lantz, M.D., who autopsied the body, Ms. Rodriguez was in the early stages of decomposition at the time that her body was discovered. Dr.

Lantz observed "maggot activity around the incision on the skin," incision marks around her clavicle, and a number of bruises all over her body characteristic of defensive wounds." Dr. Lantz opined that "the cause of death was manual strangulation," that Ms. Rodriguez had been decapitated after her death, and that, while there was "not exactly" "a scientific way to determine a postmortem interval," he believed, based upon information that he had received from investigating officers concerning the date upon which Ms. Rodriguez had last been seen alive and the observations that he had made during the autopsy and at the location at which the body had been discovered, that Ms. Rodriguez had died on 18 November 2010 and that the postmortem interval "was consistent with her being out there for three and a half weeks, or 24 days."

### 2. Defendant's Evidence

Although she acknowledged that a forensic pathologist would be better qualified than she was to make such a determination, Dr. Ann Ross, a forensic anthropologist, concluded that Ms. Rodriguez 's abdominal area showed no signs of greening, which appears early in the putrefaction process. In addition, Dr. Ross believed that the crime scene and autopsy photographs suggested that Ms. Rodriguez "was still in the fresh state" of decomposition at the time that her body was found given the absence of significant marbling or maggot masses. According to Dr. Ross, "the remains of the decedent were in a fresh state" and had "not been out in the environmental conditions before December 1." Similarly, Thomas L. Bennett, M.D.,

a forensic pathologist, was of the opinion that "the most probable time frame" "is that [Ms.] Rodriguez was dead between three and seven days or so prior to her body being found on December 12th."

### B. Intellectual Disability

### 1. Defendant's Life History

Defendant was born on 11 November 1974 in the Usulutan Department of El Salvador. Defendant and his family left the Usulutan Department "somewhere between 1979 and 1982" "because of the guerillas, who were the leftist fighters in the civil war in El Salvador." Defendant's family ultimately settled in Anchila, a location that was believed to be safe, when defendant was a child. However, the guerillas "began to occupy the area across the river from Anchila" after the Rodriguez family arrived at that location.

The Rodriguez home in Anchila was a "one-room hut[ ] with dirt floors. The walls were made out of sticks and mud." Although the roof was made out of "grass or tin," "there[ was] no solid wall" or "security to speak of." "[D]uring the rainy season, the floods would flood through the house," exposing the family "to all kinds of bacteria, viruses, decaying animals, [and] human waste" from a nearby outhouse.

While in Anchila, defendant "didn't have access to medical care," did not "attend school of any kind," and experienced "[c]hronic hunger [as] a way of life." Upon reaching the age of nine, defendant was sent to live with an aunt in San Salvador, which was considered to be safer and to have less fighting than Anchila.

While in San Salvador, defendant began to receive medical care and entered the first grade. After successfully completing the first grade while failing the second grade, defendant returned to Anchila to help his family and repeat the second grade when he was eleven or twelve years old.

At the time that defendant returned to Anchila, "the civil war was very much raging around the family." Defendant heard "shooting at night and [remembered] the family being on the floor in terror." "It was not uncommon for [the family] to see dead bodies along the way when they were walking to school" and to "hear bomb[s] blasting[ ] and shooting." When defendant was sixteen years old, his older brother, Jose Fermin, was killed by guerillas after joining the army. Defendant was responsible for retrieving his brother's body and bringing it to the family home. While he was still sixteen and in the seventh grade, defendant dropped out of school.

After Jose Fermin's death and defendant's marriage to Ms. Rodriguez, defendant relocated to the United States. Upon arriving in this country, defendant was granted asylum on the grounds that he had been "threatened by the guerillas" and was "[l]iving in constant fear" and received authorization to work. Although defendant's son, Fermin, remained in El Salvador with defendant's father, Ms. Rodriguez joined defendant in the United States, where the couple had three more children, Santos Estela, Juan Carlos, Jr., and Jonathan.

2. Expert Testimony

a. Defendant's Evidence

Dr. Selena Sermeno, an expert in the field of clinical psychology who specializes in issues involving El Salvadoran young people, testified that the "protective and risk factors" present in a child's life, coupled with "the presence of chronic violence and trauma and adversity" and "[f]actors such as poverty, malnutrition, poor health, falls, exposure to trauma, any form of traumatic event, [and] the presence of fear," affect the child's intellectual capabilities. According to Dr. Sermeno, the civil war that occurred in El Salvador during defendant's adolescence had a significant negative effect upon his cognitive development. Among other things, Dr. Sermeno observed that defendant's memory and communication skills were impaired, which is "a very classic symptom in children who are traumatized to that degree." Defendant struggled "to recall information in any kind of chronological sequential or linear format," was confused by numerical concepts, and answered questions in a very literal manner. In addition, defendant's exposure to dangerous pesticides and contaminated water caused him to suffer from frequent illnesses, for which he never received proper medical care. Dr. Sermeno believed that the existence of these adverse environmental conditions had a significant effect upon defendant's intellectual development as well.

According to Dr. Sermeno, defendant suffered from post-traumatic stress disorder and a mild intellectual disability. In support of the second of these two

diagnoses, Dr. Sermeno pointed to the fact that defendant scored 61 on the third edition of the Wechsler Adult Intelligence Scale (WAIS-III). In Dr. Sermeno's view, defendant had particular difficulties with functional academic learning and communication skills, with these deficiencies having manifested themselves before defendant reached the age of eighteen. In addition, Dr. Sermeno's intellectual disability diagnosis also rested upon defendant's exposure to extreme poverty, severe malnutrition, constant violence, pesticides, educational obstacles, and inadequate health care. Finally, Dr. Sermeno believed that defendant's post-traumatic stress disorder made it difficult for him to express strong emotions through verbal communication and body language.

Moira Artigues, M.D., a general and forensic psychiatrist, testified that she had evaluated defendant's "developmental history and the impact that that may have had on him, as well as . . . his affect and demeanor, his face and his manner, and to form opinions about that as well." Dr. Artigues analyzes whether a person has an intellectual disability by examining that person's "background information, in terms of poverty, malnutrition, deprivation, education resources, and medical resources," "[b]ecause lack in any of those can affect intellectual development in children." According to Dr. Artigues, severe trauma, like that associated with "growing up in a civil war, very poor, and malnourished, causes the brain to wire in a way that's not optimal, and it can certainly affect your IQ as a result of the faulty wiring." As a child in El Salvador, defendant lacked access to medical care, experienced nutritional

deprivation, and had no educational stimulation until he reached the age of ten, all of which can affect an individual's brain development and contribute to the development of a low intelligence quotient. Moreover, the experience of growing up during a civil war can result in accumulated trauma over time which can, in turn, lead to the development of post-traumatic stress disorder. In Dr. Artigues's view, a child's attempts to cope "with this chronic trauma and extreme stress" can affect the child's brain development and intelligence quotient.

In Dr. Artigues's opinion, defendant was mildly intellectually disabled. In support of this assertion, Dr. Artigues considered the fact that defendant had to make six different attempts to pass his driver's license test after reaching the United States. In addition, Dr. Artigues noted that, while interviewing defendant, he failed to grasp abstract concepts and had difficulty relaying information in chronological order, both of which conditions, in Dr. Artigues's opinion, reflect the existence of an intellectual disability. Dr. Artigues testified that defendant learned how to be a brick mason by being shown measurements marked permanently on a yardstick rather than by utilizing mathematics, with this type of learning limitation being typical of persons suffering from a mild intellectual disability. According to Dr. Artigues, intellectually disabled individuals have the ability to drive motor vehicles, work, marry, and have children. Dr. Artigues believed that defendant's intellectual disability manifested itself before he turned eighteen years of age in light of defendant's school records, intelligence quotient test scores, the results achieved

during defendant's psychological evaluations, and defendant's exposure to malnutrition, severe trauma, and poverty. In Dr. Artigues's view, defendant was significantly deficient in functional academics and communication skills. Finally, Dr. Artigues determined that defendant suffered from post-traumatic stress disorder given that he had been exposed to significant trauma during his life, reported having had intrusive thoughts about the traumatic events that he had experienced, and experienced certain specific triggering events.

Dr. Antonio Puente, a clinical neuropsychologist and professor of psychology at the University of North Carolina at Wilmington, conducted a neuropsychological evaluation of defendant. Dr. Puente testified that the fact that defendant had a full scale score of 61 on the Central American, Spanish language version of the WAIS-III placed defendant in the bottom one percentile of the population. In addition, Dr. Puente administered the Beta Test, Third Edition; the Comprehensive Test of Nonverbal Intelligence, Second Edition; and the Bateria Test, Third Edition, to defendant. According to Dr. Puente, the Beta test was developed to measure the intellectual abilities of individuals who lack a formal education. Defendant had a score of 65 on the Beta Test, a result that placed him in the bottom one percent of the population. Similarly, Dr. Puente testified that defendant's full-scale score of 53 on the Comprehensive Test of Nonverbal Intelligence placed him in the bottom percentile. Although the Bateria test does not produce an intelligence quotient score, it does generate an intellectual abilities number. Defendant's intellectual abilities

score placed him in the second percentile from the bottom. According to Dr. Puente, mild intellectual disability involves an intelligence quotient of between 50 and 70.

Another sign of mild intellectual disability, in Dr. Puente's view, is the presence of only some of the skills that allow an individual to function in society. Dr. Puente undertook this portion of his analysis by examining defendant's school records, driving tests, and the opinions of knowledgeable persons concerning defendant's functional capabilities. In addition, Dr. Puente administered sixteen additional neuropsychological tests to defendant, three of which were used to assess the reliability of defendant's responses and the adequacy of defendant's efforts during the testing process. According to Dr. Puente, defendant's test results did not reflect malingering and accurately demonstrated the extent of defendant's abilities. As a result, Dr. Puente testified that defendant has significant sub-average intellectual functioning; has deficient cognitive, social, and practical skills; and is significantly impaired in the areas of functional academics and communication skills, with all of these diagnostic criteria having manifested themselves before defendant attained the age of eighteen.

### b. State's Evidence

Stephen Kramer, M.D., a forensic neuropsychiatrist and professor of psychiatry at Wake Forest Baptist Medical Center, testified on behalf of the State that the El Salvadoran school system, which is much less rigorous than the United States school system, grades students on a scale from one to ten, with five being the

lowest passing score. According to Dr. Kramer, most of defendant's grades were in the six to seven range, a set of results that is inconsistent with the presence of mild intellectual disability. In addition, Dr. Kramer noted that defendant could perform the chores expected of similarly aged children, another fact that suggests that defendant did not suffer from mild intellectual disability. In a similar vein, Dr. Kramer noted that defendant had been able to find employment in the United States that paid more than the minimum wage and that he had been known to "motivate" his co-workers, with these facts also being inconsistent with a contention that defendant suffers from a mild intellectual disability. According to Dr. Kramer, other activities in which defendant engaged, including the payment of taxes, the maintenance of his immigration status, and his ability to obtain a driver's license, "show[ed that defendant had] a level of adaptive functioning beyond that [expected] for the deficits requisite for a diagnosis of" intellectual disability.

Dr. Kramer testified that Detective Nieves had described defendant's Spanish as grammatically correct and that defendant had used an appropriate volume when speaking with the detective. Dr. Kramer noted that defendant had received a number of visitors since the date of his incarceration, a fact that tends to suggest that defendant has a social network and demonstrates his adaptive abilities. Dr. Kramer considered defendant's request for a Spanish-to-English dictionary, a Bible, and a Spanish textbook while in pretrial detention to indicate that defendant has the apparent ability to read and desired to engage in that activity, with those attributes

further tending to show that defendant has adaptive capabilities. On the other hand, Dr. Kramer, like Dr. Artigues, believed that defendant has difficulty understanding abstract concepts like confidentiality or privacy.

According to Dr. Kramer, Dr. Puente mischaracterized the results of defendant's Dot Counting Test, an instrument used to detect malingering, because defendant "did worse the second time he did the test and was way over the threshold for suspecting not giving full effort." Dr. Kramer noted that defendant was "overtly cooperative," had a normal mood range, spoke Spanish in a clear and distinct manner while exhibiting a regular rate and rhythm, and had no difficulty with the comprehension portion of the exam. In addition, while defendant could not identify the year, month, day of the week, or season, he was able to perform complex commands without difficulty. The fact that defendant could not name the months of the year was "astonishing" to Dr. Kramer given his belief that even a person with mild intellectual disability should be able to perform that task.

Dr. Kramer administered a variety of tests for the purpose of assessing defendant's mathematical abilities, visual and verbal memory, neurological functioning, and motor skills. According to Dr. Kramer, defendant's math skills were "horrible" and included "very bizarre" responses. While completing a "literal cancellation test," which required defendant to find all of the *A*s on a page while subject to certain time constraints, defendant missed some *A*s and worked very slowly, with the physical restraints to which defendant was subject and visual deficits

which defendant experienced accounting for this aspect of his performance. Dr. Kramer determined that defendant has a score of less than one on the National Stressful Events Survey PTSD Short Scale Test, which indicated, according to Dr. Kramer, that the severity of defendant's reaction to stress was, at most, mild. Even so, Dr. Kramer diagnosed defendant as suffering from dysthymic disorder, which is a form of chronic depression, and post-traumatic stress disorder.

Dr. Kramer questioned whether defendant exhibited symptoms of significant sub-average intellectual functioning. Although the fact that defendant had lived in severe poverty and suffered from malnutrition might adversely affect his intelligence quotient scores, those factors do not appear to have actually impaired his intellectual capacity. In addition, Dr. Kramer testified that defendant's "school grades were not consistent with [those of] someone with mild intellectual disability." According to Dr. Kramer, defendant's only adaptive functioning deficiency involved functional academics. As a result, for all of these reasons, Dr. Kramer disagreed with Dr. Puente's diagnosis that defendant suffered from an intellectual disability.

<u>c. Defendant's Rebuttal Evidence</u>

Dr. John Olley, a professor at the University of North Carolina at Chapel Hill and a psychologist at the Carolina Institute for Developmental Disabilities, testified that, since a person with an intelligence quotient of between 55 and 70 can appropriately be diagnosed as mildly intellectually disabled and since defendant had a score of 61 on the WAIS-III, his intelligence quotient falls within the mildly

intellectually disabled range. In Dr. Olley's view, approximately one-third of mildly intellectually disabled persons are able to obtain a driver's license or learner's permit. Dr. Olley asserted that "a person's accomplishments" cannot "rule out" the existence of an intellectual disability given that such a "diagnosis is based on identifying deficits, not identifying strengths," and revolves around "a pattern of lifelong limitations." In addition, Dr. Olley stated that the American Association of Intellectual and Development Disabilities (AAIDD), which was formerly known as the American Association of Mental Retardation, believes that socioeconomic factors, such as malnutrition, poverty, and lack of access to early childhood education, are "causative or at least high-risk factors in the diagnosis of" intellectual disabilities. According to Dr. Olley, the AAIDD attributes intellectual disabilities to biological, behavioral, social, and educational factors, with the biological factor being present in only the more severe cases of intellectual disabilities and with the other factors contributing to less severe cases. In Dr. Olley's view, poverty can contribute to a diagnosis of intellectual disability.

### 3. Capital Sentencing

### a. State's Evidence

According to Lieutenant Tollie, the Rodriguez children had initially been placed in foster care before going to live with Ms. Rodriguez's father, who resides in Boston. Friends Anna and Merlyn Rodriguez described Ms. Rodriguez as a very

loving and caring mother who took good care of her children and had been excited to begin a new job at McDonald's.

### b. Defendant's Evidence

Defendant had not been cited for any disciplinary infractions during the period of time in which he was held in pretrial confinement. Defendant's father, Manuel Romero, who was handicapped, loves his son very much and needs his financial support. Similarly, defendant's sister, Ana Julia Romero, testified that she loves her brother very much, that defendant denied having done anything to Ms. Rodriguez, and that Ms. Rodriguez was a very nice person who loved defendant and had been a good wife. Juan Carlos Rodriguez and Estela Santos Rodriguez expressed the desire to continue to have a relationship with their father, stated that they loved and missed him, and described Ms. Rodriguez as a loving mother.

### B. Procedural History

On 2 July 2012, the Forsyth County grand jury returned a bill of indictment charging defendant with assault with a deadly weapon inflicting serious injury and first-degree kidnapping. On 16 July 2012, the Forsyth County grand jury returned superseding indictments charging defendant with first-degree murder, assault with a deadly weapon inflicting serious injury, and first-degree kidnapping. The charges against defendant came on for trial before the trial court and a jury at the 3 February 2014 criminal session of the Superior Court, Forsyth County.

On 10 March 2014, the jury returned verdicts finding defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and the felony murder rule using first-degree kidnapping as the predicate felony, assault with a deadly weapon inflicting serious injury, and first-degree kidnapping. After accepting the jury's verdict, the trial court convened a separate proceeding for the purpose of determining whether defendant is intellectually disabled as that term is currently used in N.C.G.S. § 15A-2005. On 14 March 2014, the jury returned a verdict finding that defendant was not exempt from the imposition of the death penalty based upon intellectual disability-related grounds. On 17 March 2014, defendant unsuccessfully moved to set aside the jury verdict with respect to the intellectual disability issue. On the same day, the sentencing phase of defendant's trial commenced.

On 21 March 2014, the jury returned a verdict determining that defendant had killed Ms. Rodriguez while engaged in the commission of a first-degree kidnapping. The jury did not find as mitigating circumstances that defendant lacked a significant history of prior criminal conduct, N.C.G.S. § 15A-2000(f)(1), or that defendant had murdered Ms. Rodriguez while under the influence of a mental or emotional disturbance, *id.* § 15A-2000(f)(2). In addition, the jury rejected all proposed nonstatutory mitigating circumstances and found that no other mitigating circumstances existed, *id.* 15A-2000(f)(9). Finally, the jury found that the aggravating circumstance was sufficiently substantial to call for the imposition of the death penalty. Based upon the jury's verdicts, the trial court arrested judgment with

respect to defendant's first-degree kidnapping conviction and entered judgments

sentencing defendant to death based upon his first-degree murder conviction and to

a concurrent term of twenty-five to thirty-nine months imprisonment based upon his

conviction for assault with a deadly weapon inflicting serious injury. Defendant

noted an appeal to this Court from the trial court's judgments.[3]

## II. Legal Analysis

## A. Jury Selection

In his initial challenge to the trial court's judgments, defendant contends that

the trial court deprived him of his state and federal constitutional right to a trial by

a fair and impartial jury by prohibiting his trial counsel from questioning prospective

jurors concerning their ability to follow the applicable law prohibiting the imposition

of the death penalty upon an intellectually disabled person. More specifically,

defendant contends that "[i]t was critically important that each juror be free of any

bias regarding the exemption of [intellectually disabled] offenders from capital

punishment that would prevent that juror from deciding the question of [intellectual

disability] based on the clinical evidence in accordance with § 15A-2005," which

provides that "no defendant who is [intellectually disabled] shall be sentenced to

death." N.C.G.S. § 15A-2005 (2014). According to defendant, the jurors empaneled

---

[3] The record does not reflect that defendant filed a motion to bypass the Court of Appeals with respect to the trial court's judgment in the case in which defendant was convicted of and sentenced for assault with a deadly weapon inflicting serious injury. We grant a motion to bypass the Court of Appeals in that case on our own motion.

to hear and decide this case "were not made aware until the sentencing phase that they would need to make a determination of [intellectual disability] that could take the death penalty off the table" or questioned concerning their ability to follow the law governing the extent to which an intellectually disabled person is eligible for the imposition of the death penalty in violation of defendant's Sixth Amendment right "to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried," quoting *Conners v. United States*, 158 U.S. 408, 413, 15 S. Ct. 951, 953, 39 L. Ed. 1033, 1035 (1895), and citing *Morgan v. Illinois*, 504 U.S. 719, 727, 112  S. Ct. 2222, 2228-29, 119 L. Ed. 2d 494, 502 (1992).

The State contends, on the other hand, that the trial court did not abuse its discretion during the jury selection process by sustaining the State's objection to defendant's attempts to question prospective jurors concerning intellectual disability issues.  Contrary to defendant's assertions, the trial court simply prohibited defendant from prefacing the questions that he sought to pose to prospective jurors concerning intellectual disability issues with general legal statements.  In addition, the State contends that defendant was able to elicit the information that he sought to obtain by posing these questions based upon prospective jurors' answers to other questions that the trial court allowed defendant to pursue and statements that the trial court allowed defendant's trial counsel to make.  Finally, the State notes that the trial court properly instructed the jury concerning the effect of a finding of

intellectual disability upon the jury's ability to make a binding recommendation that defendant be sentenced to death at an appropriate point in the proceedings.

During the jury selection process, defendant's trial counsel told the trial court that defendant's "intent was to ask these jurors can they follow the law with regard to mental retardation" and that, in order to make an adequate inquiry into this subject, he would be required "to tell them a little bit about what the law is." In response, the trial judge stated that defendant would be allowed to inquire into jurors' ability to follow the applicable law and stated:

> THE COURT: Just don't give editorial comments. I certainly understand you're going to be entitled—you can preface it as, "There may be a defense or evidence of alleged mental retardation in this case. Will you be able to fairly consider it in this case?"
> Is that—does that not get you what you want? . . .
>
> [DEFENSE COUNSEL]: It does. What I would like to say is that North Carolina does not allow . . . . for a defendant to get the death penalty if they're mentally retarded; does anybody on the panel have any issues with that law.
>
> . . . .
>
> THE COURT: Does the State object to that line of questioning?
>
> [PROSECUTOR]: Yes, Your Honor. We object to him prefacing it with what the state of the law is until the jury is instructed. . . . Because we would contend it's going to be in dispute.
>
> . . . .

THE COURT: When we get to the jury instructions, I'll give them the law that applies to this particular case. You're going to be entitled to ask questions about any –

[DEFENSE COUNSEL]: And mental retardation is not a mitigating circumstance that decides, yes or no, death penalty. That's the weighing part of it. I don't want the jury confused that this is just another mitigating circumstance. It's the law that they have to first decide before they even get to that [procedure.]

THE COURT: I'm not inclined –

. . . .

THE COURT: — to allow the defendant just to state general propositions of the law. You're absolutely going to be entitled to ask jurors questions, as we've already discussed, with regard to any alleged mental retardation evidence. . . .

. . . .

THE COURT: . . . You can ask them if they can follow the law that the Court will give you with regard to mental retardation and the effect it may have as to any decisions in the case. "Can you follow the law fairly and impartially that the Judge will give you with regard to the law on mental retardation?"

. . . But I've told everybody that neither attorney should question the jurors about the law except to ask whether they will follow the law as given to you by the Court.

After the prospective jurors returned to the courtroom at the conclusion of this colloquy between the trial court and counsel for the parties, defendant's trial counsel stated, without objection, that "[m]ental retardation is a defense to the death penalty"

and that "[m]ental retardation is defined, among other things, as having a low IQ" and, along with the prosecutor, asked prospective jurors numerous questions related to intellectual disability issues.

"The primary goal of the jury selection process is to ensure selection of a jury comprised only of persons who will render a fair and impartial verdict." *State v. Locklear*, 331 N.C. 239, 247, 415 S.E.2d 726, 731 (1992) (citation omitted). "Pursuant to N.C.G.S. § 15A-1214(c), counsel may question prospective jurors concerning their fitness or competency to serve as jurors to determine whether there is a basis to challenge for cause or whether to exercise a peremptory challenge." *State v. Fullwood*, 343 N.C. 725, 732, 472 S.E.2d 883, 886-87 (1996) (citing N.C.G.S. § 15A-1214(c) (1988), *cert. denied*, 520 U.S. 1122, 117 S. Ct. 1260, 137 L. Ed. 2d 339 (1997)). As part of the jury selection process, the trial court must allow counsel an opportunity "to inquire into the ability of the prospective jurors to follow the law," with "questions designed to measure prospective jurors' ability to follow the law [being] within the [proper] context of *voir dire*." *State v. Wiley*, 355 N.C. 592, 617, 565 S.E.2d 22, 40 (2002), *cert. denied*, 537 U.S. 1117, 123 S. Ct. 882, 154 L. Ed. 2d 795 (2003). On the other hand, "[t]he trial judge has broad discretion to regulate jury *voir dire*." *Fullwood*, 343 N.C. at 732, 472 S.E.2d at 887 (citing *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, 513 U.S. 891, 115 S. Ct. 239, 130 L. Ed. 2d 162 (1994)); *see also State v. Locklear*, 349 N.C. 118, 142, 505 S.E.2d 277, 291 (1998) (explaining that "the extent and manner of the inquiry [allowed to counsel] rests

within the trial court's discretion"), *cert. denied*, 526 U.S. 1075, 119 S. Ct. 1475, 143 L. Ed. 2d 559 (1999). "In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby." *Lee*, 335 N.C. at 268, 439 S.E.2d at 559 (citations omitted). As a result, "the trial court's exercise of discretion in preventing a defendant from pursuing a relevant line of questioning" must "render[ ] the trial fundamentally unfair" in order for the defendant to be entitled to obtain relief on appeal to this Court. *Fullwood*, 343 N.C. at 732-33, 472 S.E.2d at 887 (citing, *inter alia*, *Morgan*, 504 U.S. at 730 n.5, 112 S. Ct. at 2230 n.5, 119 L. Ed. 2d at 503 n.5).

Although the trial court did inform defendant's trial counsel that they should limit their questioning of prospective jurors with respect to intellectual disability issues to inquiring whether the members of the jury "can follow the law as given to you by the Court," defendant was allowed, without any objection from the State, to explain to two different jury panels at a time when all of the prospective jurors were present that "[m]ental retardation is a defense to the death penalty." In addition, defendant's trial counsel asked prospective jurors about their prior experiences with intellectually disabled individuals, the extent of their familiarity with intelligence testing and adaptive skills functioning issues, their willingness to consider expert mental health testimony, and their willingness to follow the applicable law as embodied in the trial court's instructions. When considered in conjunction with the

fact that defendant's trial counsel was allowed to tell the prospective jurors that "[m]ental retardation is a defense to the death penalty" and the common sense understanding of a "defense" as something that precludes a finding of guilt or the imposition of a particular punishment, the questions that defendant's trial counsel were allowed to pose to prospective jurors concerning their ability to follow the law with respect to the intellectual disability issue sufficed to permit defendant's trial counsel to determine whether specific jurors could fairly consider and follow the trial court's instructions concerning the issue of whether defendant should be exempted from the imposition of the death penalty on the basis of any intellectual disabilities from which he suffered. On the other hand, the specific question that defendant sought permission to pose to prospective jurors would have done little more than elicit the prospective jurors' opinions concerning the validity of the undisputed legal principle barring the imposition of the death penalty upon intellectually disabled individuals. As a result, we do not believe that the limitations that the trial court placed upon the ability of defendant's trial counsel to question prospective jurors concerning intellectual disability issues constituted an abuse of discretion or "render[ed] the trial fundamentally unfair." *Fullwood*, 343 N.C. at 732-33, 472 S.E.2d at 887.

B. Guilt-Innocence Proceeding Issues

1. Sufficiency of the Evidence

Secondly, defendant contends that the trial court erred by denying his motion to dismiss the first-degree murder charge that had been lodged against him because the State failed to present sufficient evidence to establish his identity as the perpetrator of Ms. Rodriguez's murder. In support of this contention, defendant asserts that, when a State's case is wholly dependent upon circumstantial evidence, reviewing courts examine the record evidence for "proof of motive, opportunity, capability, and identity" in order "to show that a particular person committed a particular crime," quoting *State v. Bell*, 65 N.C App. 234, 238, 309 S.E.2d 464, 467 (1983), *aff'd*, 311 N.C. 299, 316 S.E.2d 72 (1984). Although defendant acknowledges that the record contains sufficient evidence to permit a rational juror to find that he had the capability and motive to commit first-degree murder, he contends that the State failed to elicit sufficient evidence to establish the necessary opportunity and identity. More specifically, defendant points to the expert testimony contained in the record suggesting that Ms. Rodriguez died much later than 18 November 2010 and argues that "the State lacked any eyewitness testimony or physical evidence establishing where and when the homicide occurred," with such evidence being "critical to establishing opportunity," citing *State v. Scott*, 296 N.C. 519, 522, 251 S.E.2d 414, 416-17 (1979). In response, the State contends that the evidence more than sufficed to establish that defendant murdered Ms. Rodriguez, with defendant's

argument resting upon an interpretation of the evidence that is favorable to himself rather than to the State.

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998) (citation omitted). "Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (citation omitted), *cert. denied*, 537 U.S. 1005, 123 S. Ct. 495, 154 L. Ed. 2d 403 (2002). "As to whether substantial evidence exists, the question for the trial court is not one of weight, but of the sufficiency of the evidence." *Id*. at 301, 560 S.E.2d at 781.

> The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion.

*State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980) (citations omitted). On the other hand, in the event that the evidence merely raises "a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983) (citations omitted). "Circumstantial evidence may

withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988).

First-degree murder "is the unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). "Premeditation and deliberation 'are not ordinarily subject to proof by direct evidence, but must generally be proved . . . by circumstantial evidence.' " *State v. Taylor*, 337 N.C. 597, 607, 447 S.E.2d 360, 367 (1994) (alteration in original) (quoting *State v. Williams*, 308 N.C. 47, 68-69, 301 S.E.2d 335, 349, *cert. denied*, 464 U.S. 865, 104 S. Ct. 202, 78 L. Ed. 2d 177 (1983)).[4] "Circumstances tending to prove that the killing was premeditated and deliberate include, but are not limited to:

> (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner.

*Id.* at 607, 447 S.E.2d at 367 (quoting *Williams*, 308 N.C. at 69, 301 S.E.2d at 349); *see also State v. Trull*, 349 N.C. 428, 448, 509 S.E.2d 178, 192 (1998) (concluding that

---

[4] In February 2010, a three-judge panel of the North Carolina Innocence Commission unanimously ruled that Taylor had been wrongly convicted in 1993.

the defendant's actions in destroying evidence and attempting to cover up his involvement in the murder "permit the inference that defendant acted with premeditation and deliberation"), *cert. denied*, 528 U.S. 835, 120 S. Ct. 95, 145 L. Ed. 2d 80 (1999); *State v. Scott*, 343 N.C. 313, 341, 471 S.E.2d 605, 622 (1996) (concluding that evidence tending to show, among other things, that the "[d]efendant lied to everyone about [the decedent's] whereabouts and did not call the police or emergency medical personnel" "was sufficient to show premeditation and deliberation"); *State v. Richardson*, 328 N.C. 505, 513, 402 S.E.2d 401, 406 (1991) (concluding that evidence that the defendant strangled the victim sufficed to show premeditation and deliberation).

The evidence elicited by the State at trial tended to show that defendant had a history of abusing Ms. Rodriguez, that defendant had threatened to kill Ms. Rodriguez and to dispose of her body, that defendant violently attacked Ms. Rodriguez on 18 November 2010, that defendant was the last person to see Ms. Rodriguez alive, that defendant had been seen in the general area in which Ms. Rodriguez's body had been discovered, that defendant had attempted to clean up the location at which he assaulted Ms. Rodriguez, that defendant sent text messages from Ms. Rodriguez's phone to Merlyn Rodriguez in an attempt to establish that Ms. Rodriguez had voluntarily left the area, that Ms. Rodriguez's clothing and blood were found in defendant's vehicle, that defendant made conflicting statements concerning the circumstances surrounding Ms. Rodriguez's disappearance to various people, and

that the autopsy performed upon Ms. Rodriguez's body indicated, consistently with other evidence tending to show that blood was emanating from Ms. Rodriguez 's nose as Mr. Rodriguez carried her away, that Ms. Rodriguez had aspirated blood prior to her death. Aside from the fact that the evidence contains ample support for the State's contention that defendant caused Ms. Rodriguez's death, "[t]hese facts permit the inference that defendant acted with premeditation and deliberation." *Trull*, 349 N.C. at 448, 509 S.E.2d at 192. As a result, the trial court did not err by denying defendant's motion to dismiss the first-degree murder charge for insufficiency of the evidence.

### 2. Admission of Evidence Concerning Dr. Kramer's Former Employment

Thirdly, defendant contends that the trial court erred by allowing the State to elicit, over objection, evidence that one of defendant's trial counsel had previously hired Dr. Kramer to testify on behalf of another client. In defendant's view, "[t]he State improperly vouched for Dr. Kramer's credibility by eliciting testimony that Dr. Kramer had been hired by Robert Campbell, one of Mr. Rodriguez's attorneys, to testify on behalf of a criminal defense client in another case and in highlighting the prior employment in its closing argument," with this error having been particularly prejudicial given that the State's opposition to defendant's claim to be exempt from the imposition of the death penalty on intellectual disability grounds rested solely upon the credibility of Dr. Kramer's opinion that defendant was not intellectually disabled. In response to defendant's assertion, the State contends that the challenged

testimony was relevant to the issue of Dr. Kramer's lack of bias and that the trial court did not err by allowing its admission.

When conducting a cross-examination, a prosecutor may not "inject into questions 'his own knowledge, beliefs, and personal opinions not supported by the evidence.'" *State v. Sanderson*, 336 N.C. 1, 14, 442 S.E.2d 33, 41 (1994) (quoting *State v. Britt*, 288 N.C. 699, 711, 220 S.E.2d 283, 291 (1975)); *see also State v. Phillips*, 240 N.C. 516, 527, 82 S.E.2d 762, 770 (1954) (opining that prosecuting attorneys cannot "place before the jury by argument, insinuating questions, or other means, incompetent and prejudicial matters not legally admissible in evidence"). A prosecutor does not improperly vouch for the credibility of a State's witness, or otherwise "inject" "his own knowledge, beliefs, and personal opinions" into questioning, *Sanderson*, 336 N.C. at 14, 442 S.E.2d at 41, by merely explaining why the jury should find a State's witness to be credible. *State v. Bunning*, 338 N.C. 483, 488-89, 450 S.E.2d 462, 464 (1994). "A witness may be [questioned concerning] any matter relevant to any issue in the case, including credibility." *State v. Lewis*, 365 N.C. 488, 494, 724 S.E.2d 492, 497 (2012) (quoting N.C.G.S. § 8C-1, Rule 611(b) (2011)). "We have long held that evidence of bias is logically relevant to a witness' credibility . . . ." *Id.* at 494, 724 S.E.2d 497; *see also State v. Atkins*, 349 N.C. 62, 83, 505 S.E.2d 97, 110 (1998) (concluding that "the State appropriately attempted to illustrate a potential source of witness bias, as revealed by the expert witness's own *curriculum vitae*"), *cert. denied*, 526 U.S. 1147, 119 S. Ct. 2025, 143 L. Ed. 2d 1036

(1999). If the record at trial "reveals significant discrepancies between the diagnosis made by defendant's . . . expert and the diagnosis reached by the State's expert," "it [is] entirely proper to elicit testimony indicative of potential witness bias." *Atkins*, 349 N.C. at 83, 505 S.E.2d at 111. A prosecutor's decision to elicit evidence tending to show a lack of bias on the part of a State's witness does not constitute impermissible prosecutorial vouching. *See Bunning*, 338 N.C. at 489, 450 S.E.2d at 464 (concluding that "statements by the prosecuting attorney were more in the nature of giving reason why the jury should believe the State's evidence than that the prosecuting attorney was vouching for the credibility of the State's witnesses or for his own credibility").

As we have already noted, Dr. Kramer testified that he disagreed with Dr. Puente's determination that defendant suffers from a mild intellectual disability. In view of the "significant discrepancies between the diagnosis made by defendant's . . . expert and the diagnosis reached by the State's expert," "it [is] entirely proper to elicit testimony indicative of potential witness bias," or the lack thereof. *Atkins*, 349 N.C. at 83, 505 S.E.2d at 111. The prosecutor's decision to elicit evidence to the effect that Dr. Kramer had previously performed work for one of defendant's trial counsel did not "inject" the prosecutor's personal opinions into defendant's intellectual capabilities. On the contrary, the evidence elicited in response to the relevant prosecutorial questions tended to show a lack of bias on the part of Dr. Kramer by demonstrating that he had previously worked on behalf of both the State and criminal

defendants. Although the trial court might have been better advised to have exercised its discretionary authority pursuant to N.C.G.S. § 8C-1, Rule 403, to limit the scope of the prosecutor's inquiry to whether Dr. Kramer had previously worked for counsel representing criminal defendants in general rather than specifically identifying one of defendant's trial counsel as an attorney to whom Dr. Kramer had provided expert assistance, we are unable to say, given the record before us in this case, that the challenged testimony constituted impermissible prosecutorial vouching for Dr. Kramer's credibility or that the trial court erred by refusing to preclude the admission of the challenged testimony.

### C. Intellectual Disability Proceeding

Next, defendant contends that he demonstrated that he suffers from an intellectual disability by a preponderance of the evidence and that the trial court erred by denying his motion to set aside the jury's verdict in the State's favor with respect to this issue. As defendant notes, he was required to prove that he had "significantly subaverage general intellectual functioning" and "significant limitations in adaptive functioning" that "was manifested before the age of 18," quoting N.C.G.S. § 15A-2005(a)(2), by a preponderance of the evidence in order to be found to be exempt from the imposition of the death penalty upon intellectual disability grounds, citing *id*. § 15A-2005(f). Defendant claims to have satisfied his burden of proof with respect to this issue given that three of his intelligence quotient scores were below 70, that three separate expert witnesses testified that he had

significant limitations in at least two of the statutorily enumerated areas of adaptive functioning, and that each of defendant's experts testified that defendant's mild intellectual disability manifested itself before he reached the age of eighteen. According to defendant, the State's expert did little more than challenge the evidence tending to show that defendant exhibited subaverage intellectual functioning as "questionable" and agreed that defendant had an adaptive deficit in the area of functional academics. In response, the State contends that a reviewing court should not disturb a jury determination with respect to the issue of intellectual disability in the event that there is any competent evidence reasonably tending to support it and that the record provided ample support for the jury's determination that defendant had failed to establish that he should be exempt from the imposition of the death penalty on intellectual disability grounds.

A trial court's ruling with respect to a motion to set aside a jury verdict "will not be disturbed on appeal absent an abuse of discretion." *State v. Batts*, 303 N.C. 155, 162, 277 S.E.2d 385, 389 (1981) (citations omitted) (upholding the denial of a motion to set aside a verdict after finding that "[t]here was sufficient evidence to warrant submission of the case to the jury and to support its verdict"). According to well-established North Carolina law, "[t]he credibility of the witnesses, the weight of the testimony, and conflicts in the evidence are matters for the jury to consider and pass upon," *State v. Alford*, 329 N.C. 755, 761, 407 S.E.2d 519, 524 (1991) (citations omitted), with the reviewing court lacking any responsibility for "pass[ing] on the

credibility of witnesses or to weigh[ing] the testimony," *State v. Hanes*, 268 N.C 335, 339, 150 S.E.2d 489, 492 (1966). Defendant's assertion that we should conduct a de novo review of the trial court's decision to refrain from setting aside the jury's verdict with respect to the intellectual disability issue amounts to a request that we reweigh the evidence and make our own factual findings on appeal, a task for which an appellate court like this one is not well suited. Although defendant did present sufficient evidence to support a determination that he should be deemed exempt from the imposition of the death penalty on intellectual disability grounds, the State presented expert testimony from Dr. Kramer tending to support a contrary determination. The relative credibility of the testimony offered by the various expert witnesses concerning the nature and extent of defendant's intellectual limitations was a matter for the jury rather than for this Court, particularly given that the burden of proof with respect to the intellectual disability issue rested upon defendant. In light of the fact that the record reveals the existence of a conflict in the evidence concerning the extent to which defendant was intellectually disabled for purposes of N.C.G.S. § 15A-2005, we are unable to conclude that the trial court abused its discretion by failing to set aside the jury's verdict in the State's favor with respect to that issue.[5]

---

[5] In his supplemental brief, defendant contends that he is entitled to relief from the trial court's intellectual disability determination on the basis of the United States Supreme Court's decision in *Moore v. Texas*, ___ U.S. ___, 137 S. Ct. 1039, 197 L. Ed. 2d 416 (2017). In support of this contention, defendant reiterates his argument, which we have already rejected, that this Court is required to undertake a de novo review of the merits of the

D. Capital Sentencing Proceeding

Finally, defendant asserts that the trial court erred at defendant's capital sentencing proceeding by failing to instruct the jury with respect to the statutory mitigating factor enumerated in N.C.G.S. § 15A-2000(f)(6), which addresses the extent to which defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired. According to defendant, the trial court must instruct the jury concerning whether a particular mitigating circumstance exists in the event that the record contains sufficient evidence to establish the existence of that mitigating circumstance, citing *State v. Hurst*, 360 N.C. 181, 197, 624 S.E.2d 309, 322, *cert. denied*, 549 U.S. 875, 127 S. Ct. 186, 166 L. Ed. 2d 131 (2006). According to defendant, the record contained ample evidence tending to show that that defendant's "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," quoting N.C.G.S. § 15A-2000(f)(6), with the jury being entitled to find the existence of the statutory mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(6) "even if a

___

intellectual disability issue and contends that a portion of the evidence that the State elicited and the arguments that the State advanced during the intellectual disability proceeding conflict with the logic that the United States Supreme Court utilized in *Moore*. However, given defendant's failure to bring a challenge to the admission of the challenged evidence or the making of the challenged arguments forward for our consideration and defendant's failure to contend that the trial court's intellectual disability instructions conflicted with *Moore* in any way, we are not persuaded that defendant's *Moore*-based arguments are properly before us or that *Moore* has any bearing on the intellectual disability issue that defendant has actually raised, which is whether the trial court abused its discretion by refusing to set the jury's verdict with respect to the intellectual disability issue aside.

defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to the know the nature and quality of the act," quoting *State v. Johnson*, 298 N.C. 47, 68, 257 S.E.2d 597, 613 (1979). More specifically, defendant contends that the record contains substantial evidence tending to show that defendant is intellectually disabled and suffers from post-traumatic stress disorder or another mental condition and that defendant killed Ms. Rodriguez in the course of a marital crisis characterized by emotional turmoil. Defendant asserts that "[t]he combination of subnormal intelligence, psychological disorders, and/or a breakdown in a relationship has often been held to support submission of both the (f)(2) and the (f)(6) statutory mitigating circumstances," citing, *inter alia*, *State v. Fullwood*, 329 N.C. 233, 404 S.E.2d 842 (1991) (concluding that the record contained substantial evidence tending to show the existence of the (f)(6) statutory mitigating circumstance given that an expert psychologist had testified that defendant had limited verbal abilities and suffered from low self-esteem); *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *vacated*, 497 U.S. 1021, 110 S. Ct. 3266, 111 L. Ed. 2d 777 (1990), *on remand*, 328 N.C. 532, 402 S.E.2d 577 (1991) (concluding that the record contained sufficient evidence to support the submission of the (f)(6) statutory mitigating circumstance given that the defendant exhibited symptoms of paranoid schizophrenia and delusional thinking); *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983) (holding that the record contained sufficient evidence to support the submission of the (f)(6) statutory mitigating circumstance given the presence of evidence tending to show

that the defendant had an intelligence quotient of 63, poor reading skills, an antisocial disorder, and a history of mental health problems).

In seeking to persuade us to reach a different result, the State argues that this Court has noted that the (f)(6) statutory mitigating circumstance

> has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions.

*State v. Kemmerlin*, 356 N.C. 446, 479, 481, 573 S.E.2d 870, 893, 894 (2002) (concluding the trial court did not err by failing to submit the (f)(6) statutory mitigating circumstance even though a defense mental health expert diagnosed defendant with borderline personality disorder and major depressive disorder on the grounds that the expert also testified that these conditions "did not prevent defendant from appreciating the criminality of her conduct and controlling her conduct as required by law"). Moreover, the State asserts that this Court has concluded that a defendant's conduct in the time leading up to and following the murder "may demonstrate that he was aware that his acts were criminal." *State v. Polke*, 361 N.C. 65, 72, 638 S.E.2d 189, 194 (2006), *cert. denied*, 552 U.S. 836, 128 S. Ct. 70, 169 L. Ed. 2d 55 (2007). Although the record did contain evidence tending to show that defendant has subaverage intellectual functioning, suffers from post-traumatic stress disorder and chronic depression, and was in the midst of a marital crisis, the State argues that the record was devoid of any evidence that these conditions impaired his

capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," quoting N.C.G.S. § 15A-2000(f)(6), at the time that he murdered Ms. Rodriguez. On the contrary, according to the State, the evidence concerning defendant's conduct before and after the murder of Ms. Rodriguez demonstrated defendant's awareness that "his acts were criminal," quoting *Polke*, 361 N.C. at 72, 638 S.E.2d at 194. Finally, the State contends that any error that the trial court might have committed by failing to instruct the jury concerning the (f)(6) statutory mitigating circumstance was harmless given that "any such error did not prevent any juror from considering and giving weight to the mitigating evidence," quoting *State v. Ward*, 338 N.C. 64, 113, 449 S.E.2d 709, 736-37 (1994), *cert. denied*, 514 U.S. 1134, 115 S. Ct. 2014, 131 L. Ed. 2d 1013 (1995).

According to N.C.G.S. § 15A-2000(b), a trial judge is required to instruct the jury to consider any aggravating or mitigating circumstances which have adequate evidentiary support. N.C.G.S. § 15A-2000(b) (2017). For that reason, "a trial court has no discretion in determining whether to submit a mitigating circumstance when 'substantial evidence' in support of the circumstance has been presented." *State v. Watts*, 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003) (quoting *State v. Fletcher*, 354 N.C. 455, 477, 555 S.E.2d 534, 547 (2001), *cert. denied*, 537 U.S. 846, 123 S. Ct. 184, 154 L. Ed. 2d 73 (2002)), *cert. denied*, 541 U.S. 944, 124 S. Ct. 1673, 158 L. Ed. 2d 370 (2004); *see also State v. Williams*, 350 N.C. 1, 10-11, 510 S.E.2d 626, 633 (explaining that "the trial court has no discretion" and that "the statutory mitigating

circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant," if the "evidence will support a rational jury finding" concerning the existence of the mitigating circumstance) (quoting *State v. Smith*, 347 N.C. 453, 469,496 S.E.2d 357, 366, *cert. denied*, 525 U.S. 845, 119 S. Ct. 113, 142 L. Ed. 2d 91 (1998)), *cert. denied*, 528 U.S. 880, 120 S. Ct. 193, 145 L. Ed. 2d 162 (1999). "The test for determining if the evidence is 'substantial evidence' " to support an instruction for a statutory mitigating circumstance, "is 'whether a juror could reasonably find that the circumstance exists based on the evidence.' " *Watts*, 357 N.C. at 377, 584 S.E.2d at 748 (quoting *Kemmerlin*, 356 N.C. at 478, 573 S.E.2d at 892 (internal quotation marks omitted)). As a result, "[e]ven if the defendant does not request the submission of the [statutory] mitigator or objects to its submission, the trial court must submit the circumstance when it is supported by sufficient evidence," *State v. Cummings*, 361 N.C. 438, 471, 648 S.E.2d 788, 808 (2007) (citations omitted), *cert. denied*, 552 U.S. 1319, 128 S. Ct. 1888, 170 L. Ed. 2d. 760 (2008), with "any reasonable doubt regarding the submission of a statutory or requested mitigating factor [to] be resolved in favor of the defendant," *State v. Phillips*, 365 N.C. 103, 146, 711 S.E.2d 122, 152 (2011) (quoting *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 825 (1985), *cert. denied*, 476 U.S. 1164, 106 S. Ct. 2293, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)), *cert. denied*, 565 U.S. 1204, 132 S. Ct. 1541, 182 L. Ed. 2d 176 (2012). In other words, the actual fact-finding decision must, under the procedures outlined in North Carolina's capital

sentencing statues, be made by the jury rather than the trial or a reviewing court. "[F]ailure to submit a statutory mitigating circumstance that is supported by sufficient evidence is prejudicial error unless the State can demonstrate that the error was harmless beyond a reasonable doubt." *Hurst*, 360 N.C. at 194, 624 S.E.2d at 320 (citation omitted).

N.C.G.S. § 15A-2000(f)(6) creates a statutory mitigating circumstance applicable to situations in which "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6) (2017). The (f)(6) statutory mitigating circumstance

> may exist even if a defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to know the nature and quality of that act. It would exist even under these circumstances if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished).

*Johnson*, 298 N.C at 375, 259 S.E.2d at 764. Evidence, "expert or lay, of some mental disorder, disease, or defect . . . to the degree that it affected the defendant's ability to understand and control his actions" supports submission of the (f)(6) statutory mitigating circumstance. *Kemmerlin*, 356 N.C. at 479, 573 S.E.2d at 893 (quoting *State v. Syriani*, 333 N.C. 350, 395, 428 S.E.2d 118, 142-43, *cert. denied*, 510 U.S. 948,

114 S. Ct. 392, 126 L. Ed. 2d 341 (1993)). Even "[i]f the jury determines that the defendant does not have an intellectual disability as defined by [N.C.G.S. § 15A-2005], the jury may consider any evidence of intellectual disability presented during the sentencing hearing when determining aggravating or mitigating factors and the defendant's sentence." N.C.G.S. § 15A-2005(g) (2017), *see also Bobby v. Bies*, 556 U.S. 825, 829, 129 S. Ct. 2145, 2149, 173 L. Ed. 2d 1173, 1178-79 (2009) (explaining that "mental retardation for purposes of *Atkins*[ *v. Virginia*], and mental retardation as one mitigator to be weighed against aggravators, are discrete issues").

In *Fullwood*, this Court found that the record contained "substantial evidence to support [the (f)(6)] statutory mitigating circumstance," including expert testimony tending to show that the defendant's intelligence was between "low normal" and "retarded," that the defendant "suffered from very low feelings of self-esteem and 'inadequate personality,'" that the defendant's "ability to understand and be understood through words was severely limited," and that the defendant was suffering from emotional anguish at the time that he committed the murder at issue in that case. 329 N.C. at 237, 404 S.E.2d at 844. Among other things, the expert witness upon whose testimony we relied in concluding that the record supported the submission of the (f)(6) statutory mitigating circumstance in *Fullwood* stated that "the stress from [the defendant's] poor relationship with his lover and child affected the defendant's limited intellectual resources to the extent that the defendant's judgment was very poor at the moment of the crime." *Id.* at 237, 404 S.E.2d at 844.

Similarly, we have also stated that the record contained sufficient evidence to support the submission of the (f)(6) statutory mitigating circumstance to the jury in light of the existence of evidence concerning the defendant's "impoverished skills," "chronic substance abuse," "poor impulse control," and "diminished capacity" resulting in the defendant's "failure to understand the consequences of his actions." *State v. Hooks*, 353 N.C. 629, 641-42, 548 S.E.2d 501, 510 (2001), *cert. denied*, 534 U.S. 1155, 122S. Ct. 1126, 151 L. Ed. 2d 1018 (2002).

The issue of whether the trial court should submit the (f)(6) statutory mitigating circumstance to the jury does not hinge upon the presence or absence of evidence tending to show that the defendant "was under the influence of a mental or emotional disorder or disturbance" "at the time of the killing." *State v. Geddie*, 345 N.C. 73, 102-03, 478 S.E.2d 146, 161 (1996) (ellipses in original) (finding that "[t]he use of the word 'disturbance' in the (f)(2) circumstance shows the General Assembly intended something more . . . than mental impairment which is found in [the (f)(6)] mitigating circumstance' "), *cert. denied*, 522 U.S. 825, 118 S. Ct. 86, 139 L. Ed. 2d 43 (1997) (quoting *State v. Spruill*, 320 N.C. 688, 696, 360 S.E.2d 667, 671 (1987), *cert. denied*, 486 U.S. 1061, 108 S. Ct. 2833, 100 L. Ed. 2d 934 (1988)). For example, in *State v. Stokes*, this Court held that evidence tending to show that the defendant had a lengthy history of "mental problems," was "mildly retarded," and suffered from an "antisocial disorder," 308 N.C. at 655, 304 S.E.2d at 197, sufficed to support a jury determination "that defendant's capacity to fully comprehend the wrongfulness of his

conduct was impaired or diminished" so as to require the trial court to "submit[ ] the mitigating circumstance set forth in G.S. 15A-2000(f)(6) to the sentencing jury," *id.* at 656, 304 S.E.2d at 197, even though the record also contained evidence tending to show that the defendant "was capable of distinguishing right from wrong at the time of the offenses were committed," *id.* at 654, 304 S.E.2d at 197.

The record before us in this case contains ample support for the submission of the (f)(6) statutory mitigating circumstance. As an initial matter, we note that the record contains considerable evidence tending to show that defendant suffered from an intellectual disability, with the relevant evidence including expert testimony that defendant had an average intelligence quotient score of 61, that this intelligence quotient score placed defendant in the lowest two percent of the population, that defendant's intellectual disability initially manifested itself before defendant reached the age of eighteen, and that defendant's intelligence level will remain constant throughout his life. In addition, the record contains ample evidence that defendant suffers from multiple deficiencies in adaptive functioning and that defendant's exposure to extreme poverty, severe malnutrition, constant violence, and harmful pesticides, coupled with his lack of formal education and access to meaningful health care, make it more likely that defendant suffers from an intellectual disability. As Dr. Puente noted, a defendant's diminished intellectual capabilities impair his or her reasoning capabilities. Secondly, the expert testimony contained in the present record contains near-unanimous support for the proposition that defendant suffers

from an emotional disorder, such as dysthymic disorder (chronic depression) or post-traumatic stress disorder, and that defendant killed Ms. Rodriguez during a time of marital turmoil.  As this Court indicated in *State v. Greene*, 329 N.C. 771, 777, 408 S.E.2d 185, 188 (1991), "an abnormally susceptible defendant" can be motivated "to commit murder" by emotional turmoil despite the fact that "a person of normal mental and emotional stability would likely have resolved [the situation] without such disastrous results."  The evidence of defendant's mental limitations and disturbed and overwrought thinking supports a rational inference that defendant's ability to fully comprehend the wrongfulness of his conduct and to conform his conduct to the requirements of the law was adversely affected at the time that he murdered Ms. Rodriguez.  Thus, the evidence contained in the record developed in this case, like the evidence that this Court considered in cases such as *Stokes* and *Fullwood*, more than suffices to permit a rational juror to conclude that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time that he murdered Ms. Rodgriquez was impaired, so that the trial court erred by failing to submit the (f)(6) statutory mitigating circumstance to the jury.

The State's contention that the actions in which defendant engaged following the murder of Ms. Rodriguez establish defendant's awareness that his actions were wrongful rests upon a misapprehension of the nature and effect of the relevant statutory mitigating circumstance and the standard that the trial court should utilize

in determining whether a particular mitigating circumstance should be submitted to the jury. In essence, the State's argument assumes that any recognition of the wrongfulness of his conduct on defendant's part suffices to preclude the necessity for the submission of the (f)(6) statutory mitigating circumstance. Aside from the fact that this aspect of the State's argument might be understood to require us to make a factual, rather than a sufficiency of the evidence, determination, a rational juror is entitled, as this Court recognized in *Johnson*, to find the existence of the (f)(6) statutory mitigating circumstance even if the defendant knew "right from wrong," understood "the nature and quality of [the] act," and "appreciate[d] . . . the criminality" of the act at the time of the commission of the murder for which he or she is being sentenced. 298 N.C. at 375, 259 S.E.2d at 764. Although intellectually disabled and emotionally disturbed and overwrought individuals "frequently know the difference between right and wrong," "they have diminished capacities to understand and process information, to communicate, to abstract from mistakes, and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others" "[b]ecause of their impairments." *Atkins v. Virginia*, 536 U.S. 304, 318, 122 S. Ct. 2242, 2250, 153 L. Ed. 2d 335, 348 (2002). As a result, even though the record in this case certainly contains evidence tending to suggest that, at some level, defendant understood the criminality of his conduct and attempted to undertake actions that were intended to avoid the consequences of his wrongful conduct, that fact does not obviate the necessity for the submission of the

(f)(6) statutory mitigating circumstance given that the relevant legal test does not treat any recognition of wrongful conduct on the part of a defendant as sufficient to support the non-submission of the statutory mitigating circumstance in question.

The State's suggestion that defendant's failure to present explicit evidence that the mental and emotional conditions from which he suffered existed and affected his conduct at the time that he murdered Ms. Rodriguez is equally misplaced. As an initial matter, we note that, while such evidence is necessary to support a finding that the statutory mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(2) exists, the same is not true with respect to the statutory mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(6). *See Geddie*, 345 N.C. at 102, 478 S.E.2d at 161. Aside from the fact that Dr. Puente testified that defendant's intellectual limitations adversely affected his judgment at the time that he murdered Ms. Rodriguez, the evidence tending to show that defendant's intellectual disability had manifested itself before the time that defendant turned eighteen and the evidence tending to show that defendant's post-traumatic stress disorder had its origins in the impoverished and violent circumstances surrounding his childhood provide ample support for an inference that the conditions that tend to suggest the appropriateness of submitting the (f)(6) statutory mitigating circumstance existed and affected defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time that he killed his estranged wife. As a result, given that "any reasonable doubt regarding the submission of a statutory

or requested mitigating factor [must] be resolved in favor of the defendant," *Phillips*, 365 N.C. at 146, 711 S.E.2d at 152 (alteration in original) (quoting *State v. Brown*, 315 N.C. at 62, 337 S.E.2d at 825), and given that this Court has never required that the record contain explicit expert or lay testimony couched in the language set out in N.C.G.S. § 15A-2000(f)(6) as a precondition for the submission of the (f)(6) statutory mitigating circumstance to the jury, we conclude that the trial court erred by failing to submit the (f)(6) statutory mitigating circumstance to the jury at defendant's capital sentencing hearing.

Finally, we are unable to hold that the trial court's failure to instruct the jury concerning the statutory mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(6) was harmless beyond a reasonable doubt. The State's argument to the contrary notwithstanding, this Court has held that an erroneous failure to submit a statutory mitigating circumstance to the jury at a capital sentencing hearing is not cured by the submission of other statutory and non-statutory mitigating circumstances given that "[e]ach mitigating circumstance is a discrete circumstance" with "its own meaning and effect." *Greene*, 329 N.C. at 776, 408 S.E.2d at 187. For that reason, the submission of other statutory and non-statutory mitigating circumstances and the catch-all mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(9) did not provide the jury with an adequate opportunity to consider the extensive evidence tending to show that defendant's "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was

impaired." In addition, given the nature and extent of the evidence contained in the present record concerning defendant's intellectual limitations, mental health diagnoses, and emotional turmoil, we are unable to conclude beyond a reasonable doubt that no juror would have found the existence of the (f)(6) statutory mitigating circumstance and given it substantial weight in the jury's ultimate decision had the (f))(6) statutory mitigating circumstance been submitted to the jury at defendant's capital sentencing hearing. As a result, defendant is entitled to a new capital sentencing hearing.[6]

### III. Conclusion

Thus, for the reasons set out above, we hold that the guilt-innocence and intellectual disability proceedings conducted before the trial court were free from error and that the outcomes reached in those proceedings should remain undisturbed. We further conclude, however, that the trial court committed prejudicial error by failing to submit the statutory mitigating circumstance enumerated in N.C.G.S. § 15A-2000(f)(6) to the jury at defendant's capital sentencing hearing. As a result, defendant's death sentence is vacated and this case is remanded to the Superior Court, Forsyth County for a new capital sentencing hearing.

---

[6] In view of our decision that defendant is entitled to a new capital sentencing hearing, we need not address defendant's remaining challenges to his death sentence.

NO ERROR IN GUILT-INNOCENCE PROCEEDING; DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

Chief Justice MARTIN dissenting.

Defendant beat and abducted his wife, Maria Rodriguez, before strangling her to death. After defendant strangled Maria, he decapitated her and hid her head and the rest of her body in two separate places. Maria's skull was not found for two and a half years.

A Forsyth County jury unanimously sentenced defendant to death for this premeditated and deliberate murder. Rather than respecting the jury's carefully considered sentencing verdict, the majority tries mightily to apply the facts of this case to the statutory mitigating circumstance found in N.C.G.S. § 15A-2000(f)(6). In doing so, the majority overlooks the complete lack of evidence linking defendant's purported intellectual impairment, mental disorders, and marital strife to his homicidal conduct. The majority also ignores the evidence showing that defendant's actions were carefully premeditated and that he took many steps to conceal his identity as the perpetrator, evidence that would clearly prevent any reasonable juror from finding the existence of the (f)(6) mitigating circumstance. For those reasons, the majority's holding is unsupported by the relevant sentencing statute and is inconsistent with the vast majority of our decisions interpreting it. I therefore respectfully dissent.

During the sentencing phase of a capital case, the trial court must submit a statutory mitigating circumstance to the jury if the defendant has presented

"substantial evidence" of that circumstance. *State v. Watts*, 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003) (quoting *State v. Fletcher*, 354 N.C. 455, 477, 555 S.E.2d 534, 547 (2001), *cert. denied*, 537 U.S. 846, 123 S. Ct. 184 (2002)), *cert. denied*, 541 U.S. 944, 124 S. Ct. 1673 (2004). Evidence of a statutory mitigating circumstance is "substantial" only if "a juror could reasonably find that the circumstance exists based on the evidence." *Id.* (quoting *State v. Kemmerlin*, 356 N.C. 446, 478, 573 S.E.2d 870, 892 (2002)). The burden of producing substantial evidence to support the submission of a mitigating circumstance rests with the defendant. *Id.*

The (f)(6) mitigating circumstance states: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6) (2017). It therefore "embraces two types of disability, one diminishing a person's ability to appreciate the criminal nature of his conduct, and the other diminishing a person's ability to control himself." *State v. Price*, 331 N.C. 620, 630-31, 418 S.E.2d 169, 175 (1992), *judgment vacated on other grounds*, 506 U.S. 1043, 113 S. Ct. 955 (1993). But in both of these instances, a defendant must produce evidence that his capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law *was impaired*." N.C.G.S. § 15A-2000(f)(6) (emphasis added). In other words, the (f)(6) mitigating circumstance does not encompass every instance in which a defendant presents evidence of an intellectual impairment or mental disorder. *See State v. Syriani*, 333 N.C. 350, 395, 428 S.E.2d 118, 142-43 ("[The (f)(6) mitigating]

circumstance has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, . . . *to the degree that it affected the defendant's ability to understand and control his actions*." (emphasis added)), *cert. denied*, 510 U.S. 948, 114 S. Ct. 392 (1993). Instead, a defendant's intellectual impairment or mental disorder must have *actually impaired* his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law—and the burden is on the defendant to produce evidence establishing this link.

Even assuming for the sake of argument that defendant did, in fact, have an intellectual impairment, as well as two mental disorders (namely, posttraumatic stress disorder and chronic depression), and that he was experiencing marital problems with Maria at the time of the murder, the mere presence of those conditions, without more, does not require submission of the (f)(6) mitigating circumstance. *See id.* Despite the clear requirement to do so, defendant did not present any evidence demonstrating a link between those conditions, on the one hand, and his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, on the other. To support its conclusion that the trial court should have submitted the (f)(6) mitigating circumstance, the majority conspicuously forgoes any substantive analysis of *how* or *to what extent* defendant's purported intellectual impairment, mental disorders, or marital strife affected his capacity to appreciate the criminality of his conduct or to conform his conduct to the

requirements of the law.  And this is for good reason: the record contains no evidence that would support an analysis linking defendant's purported conditions to his homicidal conduct.

At trial, Judge Albright recognized the evidentiary inadequacy of defendant's request for submission of the (f)(6) mitigating circumstance, noting that defendant had failed to present "any testimony to support" that instruction.  Despite Judge Albright's astute handling of this issue, the majority tries to justify its holding by pointing to the testimony of Dr. Antonio Puente, one of defendant's expert witnesses, who testified that defendant had a very poor ability to "reason and think."  But this testimony, without more, does not show that defendant's ability to appreciate the criminality of his conduct was impaired.  Nor does this testimony, without more, suggest that defendant had an impaired ability to conform his conduct to the requirements of the law.  Poor reasoning skills do not necessarily impair one's ability to control his actions or to know what the law requires.  Requiring the submission of the (f)(6) mitigating circumstance in every instance in which a defendant has poor reasoning skills, moreover, would likely mean that the mitigating circumstance would need to be submitted in every case in which the defendant has an intellectual impairment—an approach that this Court has clearly rejected and that would be inconsistent with the limits that the statutory text of subsection (f)(6) itself imposes.

Notably, the only testimony *directly* relating to defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the

requirements of law weighs in favor of the trial court's decision *not* to submit the (f)(6) mitigating circumstance to the jury. Dr. Selena Sermeño, another one of defendant's experts, testified that defendant generally seemed to be able to discern right from wrong. This was evident, Dr. Sermeño testified, by defendant's refusal to accept a gun that a soldier offered to him during the El Salvadorian civil war, when defendant was eleven years old. This testimony likely would not, by itself, be enough to foreclose submission of the (f)(6) mitigating circumstance to the jury, *see State v. Johnson*, 298 N.C. 47, 68, 257 S.E.2d 597, 613 (1979), at least when a defendant shows a causal nexus between his intellectual impairment and his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. But here, as the trial court recognized, defendant did not present evidence linking his purported intellectual impairment to his homicidal conduct.

Defendant similarly failed to present any evidence that linked his alleged posttraumatic stress disorder to his homicidal conduct. Two of defendant's own experts—Dr. Sermeño and Dr. Moira Artigues—testified that defendant's posttraumatic stress disorder did not manifest itself through irritability or violent outbursts. Rather, it manifested itself through defendant's impaired ability to express strong emotions verbally or through body language, as well as poor sleep, flashbacks, difficulty with smells and sudden noises, and difficulty with memories. None of these symptoms have anything to do with defendant's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

And the record is similarly devoid of any explanation as to how defendant's ongoing marital problems or purported chronic depression impaired his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Because evidence of any of these links was lacking, a jury would have had to go beyond the evidence presented and speculate in order to conclude that the (f)(6) mitigating circumstance may have applied here. And when the evidence is such that a jury would have to base its finding of a mitigating circumstance "solely upon speculation and conjecture, not upon substantial evidence," submission of the instruction to the jury is "unreasonable as a matter of law." *State v. Anderson*, 350 N.C. 152, 183, 513 S.E.2d 296, 315 (quoting *State v. Daniels*, 337 N.C. 243, 273, 446 S.E.2d 298, 316-17 (1994), *cert. denied*, 513 U.S. 1135, 115 S. Ct. 953 (1995)), *cert. denied*, 528 U.S. 973, 120 S. Ct. 417 (1999).

Even assuming for the sake of argument that defendant *had* produced evidence linking his purported intellectual impairment, mental disorders, and marital problems to his homicidal conduct, the record contains ample evidence that would rebut any reasonable inference that defendant had an impaired ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. As noted earlier, a statutory mitigating circumstance must be submitted only if a juror could reasonably find its existence based on the evidence. *Watts*, 357 N.C. at 377, 584 S.E.2d at 748 (quoting *Kemmerlin*, 356 N.C. at 478, 573 S.E.2d at 892). The

majority correctly recites this standard but then misapplies it. Although the majority's analysis seems to suggest otherwise, nowhere in our precedents have we required our trial courts to view all evidence pertaining to the submission of the (f)(6) mitigating circumstance in the light most favorable to the defendant, resolving ambiguities and inconsistencies in his favor. And we have never, until today, directed our trial courts to ignore the presence of overwhelming evidence that refutes any suggestion that a defendant had an impaired capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

In fact, our precedents clearly show the opposite. We have repeatedly recognized that a trial court may, in its determination of whether to submit the (f)(6) mitigating circumstance, consider evidence rebutting a defendant's argument that the instruction should be submitted to the jury. For instance, we have held that a trial court properly did not submit the (f)(6) mitigating circumstance when a defendant's academic performance and operation of a gambling business while in prison were inconsistent with his argument that he had an impaired ability to "understand and control his actions." *State v. Braxton*, 352 N.C. 158, 215, 531 S.E.2d 428, 461 (2000), *cert. denied*, 531 U.S. 1130, 121 S. Ct. 890 (2001); *see also State v. Strickland*, 346 N.C. 443, 464, 488 S.E.2d 194, 206 (1997) ("There was no evidence that consumption of this alcohol so impaired defendant as to . . . affect[ ] his ability to control his actions. In fact, there was direct evidence to the contrary."), *cert. denied*, 522 U.S. 1078, 118 S. Ct. 858 (1998).

In a line of recent cases, this Court has placed particular emphasis on whether a defendant's acts "demonstrate that [he] was aware that his acts were criminal," therefore negating any suggestion that the defendant's capacity to appreciate the criminality of his conduct was impaired. *See State v. Polke*, 361 N.C. 65, 72, 638 S.E.2d 189, 194 (2006), *cert. denied*, 552 U.S. 836, 128 S. Ct. 70 (2007). For instance, we have held that the trial court properly declined to submit the (f)(6) mitigating circumstance to the jury when the evidence showed that the defendant lured the victim to the scene of the murder, disposed of the murder weapon, and had false identification when he was apprehended. *State v. Gainey*, 355 N.C. 73, 104, 558 S.E.2d 463, 483, *cert. denied*, 537 U.S. 896, 123 S. Ct. 182 (2002). Based on this evidence, the Court reasoned that the defendant "fully underst[ood] that his acts were criminal." *Id.* at 104, 558 S.E.2d at 483. In another case, this Court held that the trial court properly did not submit the (f)(6) mitigating circumstance when a "defendant's initial lies to police about his involvement in the murder and his washing and disposal of the murder weapon . . . tend[ed] to show that [the] defendant fully appreciated the criminality of his conduct." *State v. Badgett*, 361 N.C. 234, 258, 644 S.E.2d 206, 220 (citing *State v. Golphin*, 352 N.C. 364, 476, 533 S.E.2d 168, 240 (2000), *cert. denied*, 532 U.S. 931, 121 S. Ct. 1380 (2001)), *cert. denied*, 552 U.S. 997, 128 S. Ct. 502 (2007).

Here, defendant's conduct surrounding the murder of Maria demonstrates that he had a full grasp of the gravity and criminality of his actions. And this same

evidence showing a careful, deliberate course of action indicates that defendant's mental faculties were not impaired during the course of the murder. While the majority recognizes the brutal nature of this murder, it utterly fails to recognize the legal significance of all of the preemptive steps that defendant took to conceal his identity as the perpetrator.

Defendant's actions when he came to Maria's apartment shortly before the murder provide ample evidence of defendant's meticulous attempts to conceal his crime. When defendant started arguing with Maria inside her bedroom and Maria called for help, the children found that the bedroom door was closed and locked. He also told the children not to call the police and took Maria's cell phone away so that they could not call for help after he assaulted their mother. After ending the argument with Maria by incapacitating her, defendant transported Maria from the apartment to his car by carrying her over his shoulder, all the while covering her face with her work uniform so that the children could not see the condition of their mother's face. At that time, defendant told the children that Maria had hurt herself on some furniture and that he was going to take her to the hospital. He told a concerned neighbor a similar story and added that the children were not allowed to visit Maria.

Defendant, moreover, took a number of additional steps to avoid being identified as the perpetrator. For instance, defendant returned to Maria's apartment and attempted to clean up a pool of Maria's blood that had soaked into the carpet. He

lied to their children, to his friend, and to investigating officers about what had happened during his encounter with Maria in the bedroom. Soon after the murder, when defendant was with the children, one of them attempted to check the trunk of defendant's car to see if Maria was there. When that child saw Maria's work uniform in defendant's trunk, defendant quickly ran over and closed the trunk to try to prevent his children from investigating further. Defendant told his children that Maria's uniform was there because the doctor had given it to him. The evidence also suggests that defendant sent three text messages from Maria's cell phone trying to convince one of Maria's friends that she had run away with a new boyfriend to Spain.

Most notably, however, defendant severed Maria's head from her body after the murder and hid Maria's remains in two separate, heavily wooded areas. Maria's skull was not found for another two and a half years after the rest of her body was discovered. The authorities never recovered Maria's phone, the clothing that she wore on the night of the murder, or the object used to remove her head, suggesting that defendant carefully hid them in his effort to thwart a future prosecution.

Defendant's actions before, during, and after the murder indicate careful deliberation and an attempt to evade punishment, rebutting any reasonable inference that defendant had an impaired capacity to appreciate the criminality of his conduct. And these same actions—especially those leading up to the murder—bear no resemblance to the frenzied, hectic behavior expected of a person with an impaired capacity to conform his conduct to the requirements of the law. Nor are they

consistent with a "child-like thought process[ ]" or a "limited ability to think and reason beyond the immediate moment," as defendant argues. And despite what the majority suggests, defendant's actions demonstrate far, far more than a mere "recognition of the wrongfulness of his conduct."

Rather than acknowledging the legal significance of defendant's acts surrounding the murder and the lack of evidence linking defendant's purported mental conditions to his homicidal conduct, the majority instead focuses its analysis on two cases that are inconsistent with the language of the (f)(6) mitigating circumstance, and which, as a result, have become outliers in our jurisprudence. Specifically, the majority rests the crux of its argument on *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983), and *State v. Fullwood*, 329 N.C. 233, 404 S.E.2d 842 (1991), which, according to the majority, dispel any requirement that a defendant present evidence of a nexus between a defendant's mental condition and the defendant's homicidal conduct.

To begin with, it is worth noting that *Stokes* and *Fullwood* are inconsistent with cases that were decided before they were. In *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), this Court held that if a defendant was intoxicated at the time of the murder, but not to a degree that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired, the (f)(6) mitigating circumstance should not be submitted to the jury. *Id.* at 32-33, 257 S.E.2d at 589. This Court reaffirmed that principle in a similar case decided three years

later, *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 103 S. Ct. 474 (1982). In *Williams*, this Court held that evidence showing that the defendant drank alcohol on the night of a murder, without evidence showing "that [the defendant's] capacity to appreciate the criminality of his conduct was impaired by [that] alcohol," was insufficient to support submission of the (f)(6) mitigating circumstance. *Id.* at 687, 292 S.E.2d at 262. These cases show that a defendant must present evidence of a link to require submission of the (f)(6) factor to a jury and therefore show that *Stokes* and *Fullwood* have been outliers in our jurisprudence ever since they were decided.

More recent cases, moreover, have implicitly overruled *Stokes* and *Fullwood* (or, alternatively, have confirmed that they were wrongly decided under preexisting caselaw when they were handed down). In *State v. Hill*, 347 N.C. 275, 493 S.E.2d 264 (1997), *cert. denied*, 523 U.S. 1142, 118 S. Ct. 1850 (1998), we considered a case in which the defendant exhibited personality traits of "emotional and social alienation," "mild depression," "poor impulse control," and "subaverage intelligence." *Id.* at 301-02, 493 S.E.2d at 279. But we held that the trial court was correct not to submit the (f)(6) mitigating circumstance to the jury because "the testimony *did not establish* that [the] defendant's personality characteristics *affected his ability to understand and control his actions*." *Id.* at 302, 493 S.E.2d at 280 (emphases added). Similarly, in *State v. Gainey*, expert testimony established that the defendant suffered from "moderately severe to severe mixed personality disorder . . . , with

paranoid and schizoid features which tended to make him restless and impulsive." 355 N.C. at 103-04, 558 S.E.2d at 483. But, consistent with our holding in *Hill*, we held that this testimony, standing alone, did not amount to evidence that the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired. *See id.*

The list goes on. In *State v. Kemmerlin*, the defendant presented evidence that she had "borderline personality disorder" and "major depressive disorder." 356 N.C. at 480, 573 S.E.2d at 893. The defendant was additionally concerned that her stepson was going to sexually abuse her daughter, and, because of the defendant's own experiences suffering sexual abuse, she was "exquisitely and overly attuned to sexual issues." *Id.* at 479, 573 S.E.2d at 893. But this evidence was insufficient to support submission of the (f)(6) mitigating circumstance to the jury because the defendant's suffering, according to her own expert witness, "was not to the level of impairing her ability to appreciate the wrongfulness" of her conduct. *Id.* at 481, 573 S.E.2d at 893.

To highlight the distinction between this case and cases in which the trial court *properly* instructed the jury on the (f)(6) mitigating circumstance, we need to look no further than the majority's own citations. In *State v. Hooks*, 353 N.C. 629, 548 S.E.2d 501 (2001), *cert. denied*, 534 U.S. 1155, 122 S. Ct. 1126 (2002), the defendant suffered from chronic substance abuse and underdeveloped skills for "emotional expression, social connection, and adult functioning." *Id.* at 640, 548 S.E.2d at 509. Although it was not squarely reviewing the propriety of the trial court's submission of the (f)(6)

mitigating circumstance,[1] this Court emphasized the testimony of the defendant's

expert witness: "[The defendant's] substance dependence and the impoverished skills

for adult functioning combined such that his *ability to think through his behavior*, to

*consider the consequences of his actions*, to reasonably plan or to understand and

*appreciate the connection between his actions and consequent events* would have been

impaired at the time of the offense." *Id.* (emphases added). In other words, as this

Court recognized, the evidence indicated much more than the mere presence of a

mental impairment; rather, expert testimony directly established a nexus between

the defendant's impairments and how they manifested themselves, and therefore, a

jury could find that the defendant was not able to fully appreciate the criminality of

his conduct. *See id.*

As this Court has repeatedly recognized, then, evidence that a defendant

merely *has* an intellectual impairment or mental disorder is not enough to require

the trial court to submit the (f)(6) mitigating circumstance to the jury. Instead, the

defendant has the burden of linking his intellectual impairment or mental disorder

to his homicidal conduct. If a defendant does not produce evidence of this link, the

---

[1] The discussion of the (f)(6) mitigating circumstance in *Hooks* was dictum; the Court discussed the (f)(6) mitigating circumstance, which the trial court *did* submit to the jury, only to contrast the trial court's decision *not* to submit a different mitigating circumstance. *Id.* at 639-41, 548 S.E.2d at 508-09. Even though the Court's discussion of the (f)(6) mitigating circumstance was brief and not directly relevant to its holding, however, it is still helpful to show how the defendant in that case presented evidence linking his mental conditions to his homicidal conduct—which therefore justified the trial court's submission of the (f)(6) mitigating circumstance to the jury.

jury will not be able to infer the presence of the (f)(6) mitigating circumstance. When it cannot, the trial court should not submit that instruction to it.

In sum, the language of the (f)(6) mitigating circumstance and the weight of this Court's caselaw interpreting that statutory provision require a causal nexus between a defendant's mental condition and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. Here, defendant presented no evidence of any such link. And by selectively relying on *Stokes* and *Fullwood*—which are clear outliers in our jurisprudence—the majority is dictating a change in law that has been relatively well settled for decades. *See Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991) (noting that the "consistent development of legal principles . . . contributes to the actual and perceived integrity of the judicial process"). In any event, defendant's conduct surrounding the murder dispels any doubt that defendant freely chose not to conform his conduct to the law and fully appreciated the criminality of his conduct. I therefore respectfully dissent.

Justice NEWBY joins in this dissenting opinion.